## EXHIBIT "D"

## EXPERT REPORT OF BARKLEY CLARK

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| VICKI D. JENKINS, | ) | |
| | ) | |
| | ) | |
| Plaintiff | ) | Case No.C2-04-720 |
| | ) | Judge Edmund A. Sargus, Jr. |
| vs. | ) | Magistrate Judge Norah McCann |
| | ) | King |
| HYUNDAI MOTOR FINANCING CO., et al. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## EXPERT REPORT OF BARKLEY CLARK

**My Credentials.** My vita is attached as **Exhibit A**. I am a partner in the law firm of Stinson Morrison Hecker LLP. I am a member of the firm's Financial Services Practice Group. I have consulted with banks and other financial institutions for 42 years regarding commercial and banking law issues, including secured transactions under Article 9 of the Uniform Commercial Code and related consumer protection legislation. I have often dealt with issues involving enforcement of security interests, both commercial and consumer. I have drafted secured loan documents, and counseled secured lenders on a variety of issues, including problems posed by enforcement of security interests, the nature of "default", repossession, the elements of a commercially reasonable foreclosure sales including notice, and liability for noncompliance.

My professional career has also included a strong academic component. Most recently, I served as an Adjunct Professor at the University of Virginia, where I taught courses on Secured Transactions and Payment Systems under the UCC and federal banking law. Prior to my appointment at the University of Virginia, I taught banking law as an Adjunct Professor at the

EXHIBIT
D

Georgetown Law Center. Prior to that, I held an endowed chair in commercial and banking law at the University of Kansas School of law. For four years I served as Professor of law at the National Law Center, George Washington University, where I taught courses on Secured Transactions, Payment Systems, and Federal Regulation of Banking. I have also taught banking, commercial law and consumer protection courses at the University of Colorado, the University of Oregon, and the University of Michigan.

I regularly lecture throughout the country on banking and commercial law topics. I have taught many special seminars on secured lending at the Annual UCC Institute, the Southwest Legal Foundation at SMU in Texas, the School of Banking of the South, programs for in-house personnel at the various Federal Reserve Banks, the American Bankers Association, the American Bar Association, state Bar and Banking associations, ALI/ABA, the Practicing Law Institute, and the Bank Administration Institute. For example, I presented a keynote program on Secured Consumer Lending under Article 9 of the UCC and related consumer protection laws at the American Bar Association annual meeting in August 2007. I have given programs for ALI/ABA on enforcement of security interests in commercial and consumer credit transactions.

I have written several treatises that are widely used by financial institutions around the country, by academicians, and by attorneys who practice banking and commercial law. These treatises are regularly cited by federal and state courts. They include (1) The Law of Secured Transactions under the UCC (with Barbara Clark); (2) The Law of Bank Deposits, Collections and Credit Cards (with Barbara Clark); and Compliance Guide to Payment Systems (with Barbara Clark and Mark Hargrave). The Secured Transactions treatise includes extensive materials on default, foreclosure sales, and remedies for noncompliance. I have co-authored a law school casebook entitled Cases and Materials on Consumer Protection (with Professor Fred

Miller) and a book entitled <u>Handling Consumer Credit Cases</u> (with J. Fonseca). I also co-edit a newsletter entitled <u>Clarks' Secured Transactions Monthly.</u> Over the years, I have won a number of awards for my teaching and scholarship in these areas, and for a number of years I have been listed in <u>Best Lawyers in America.</u>

Over the years, I have been active in commercial/consumer law reform. In 1972 I consulted with the Commissioners on Uniform State Laws in the drafting of the Uniform Consumer Credit Code. I worked closely with the Kansas legislature in the enactment of the Consumer Credit Code in Kansas in 1973, as well as the enactment of the Kansas Consumer Protection Act (dealing with deceptive acts and practices in consumer sales). I wrote the original Kansas Comments to the CCC and the KCPA. In the early 1990s, I served on the original Study Committee that resulted in the drafting (and enactment by all 50 states) of Revised Article 9 of the UCC. In that capacity, I participated in the consideration of various issues relevant to this case, including security interests in consumer goods such as automobiles, and the relationship of UCC Article 9 to consumer protection legislation.

I serve on the Board of Editors of the Banking Law Journal and the UCC Law Journal. I have served as a director of a national bank. During the last 20 years, I have been engaged a number of times as an expert witness, testifying by affidavit, deposition or at trial, before federal and state courts and arbitration panels. My list of engagements is attached as **Exhibit B.**

**Materials I have Reviewed for this Report.** In preparation of this report, I have reviewed the following materials:

- o Various pleadings, including the Class Action Complaint and Answer/Counterclaim

- o Plaintiff's Motion for Class Certification

- o Judge Sargus' Opinion and Order dated September 30, 2005

- o Various Motions and supporting materials dealing with Discovery in this case

- o Letter from Mr. Seewald to Mr. Meyer regarding foreclosure notice forms used by Hyundai in various states

- o Deposition of Vicki Jenkins

- o HMA's and HMFC's Motions to Dismiss

- o Various documents related to Vicki Jenkins' claim against Hyundai

- o Various exemplar notices of foreclosure disposition used by Hyundai around the country

- o The Ohio version of Revised Article 9 of the UCC, with Official Comments

- o The Ohio Retail Installment Sales Act

- o The Ohio Consumer Sales Practices Act

- o The Hyundai Collections Policy Manual

- o A Hyundai spreadsheet on "State-Specific Notice of Intent Guidelines"

- o Various judicial decisions in Ohio and other states dealing with Article 9 of the UCC and Retail Installment Sales Acts

- o Various state consumer protection statutes and deceptive trade practices acts.

- o Various secondary sources on the laws and practices governing retail installment sales of motor vehicles, including my own treatise.

## FIRST OPINION: THE LAWS GOVERNING FORECLOSURE ON CONSUMER MOTOR VEHICLES ARE NOT UNIFORM

I have been engaged by the firm of McGlinchey Stafford PLLC to provide my professional opinion as to whether the laws governing default, foreclosure and remedies for creditor noncompliance are uniform throughout the country as they apply to secured consumer motor vehicle financing. In my opinion, the laws governing these transactions are far from

uniform. I recognize that there is a surface uniformity to enforcement of security interests under Article 9 of the "Uniform" Commercial Code. All 50 states have enacted that statute, making it seem as "uniform" as federal law. But if you drill down below the surface, you discover that it is far from a "uniform" commercial code, particularly with respect to consumer transactions.

My experience in this area, over 42 years of consulting, writing, teaching and engaging in law reform at the state and national level, has revealed to me the huge variations in the law that exist from state to state, based on large gaps in the UCC, substantial changes in the applicable statutes from the 1990s to the present time, and an uncertain overlay of related consumer protection law such as retail installment sales acts and deceptive trade practice acts. Moreover, ambiguities in the law have led to great variation in court decisions from one state to another, and even in a single state. This makes it very difficult to predict how a court in a given state would rule on issues such as (1) whether the creditor is out of compliance with a given statutory provision such as notice of a foreclosure sale, (2) remedies for noncompliance, (3) the appropriate statute of limitations, (4) which state's law applies under a proper conflict-of-law analysis, and (5) fact-intensive issues such as whether a particular foreclosure sale was "commercially reasonable".

A.      **Article 9 of the UCC is not a "Uniform" Law Governing Foreclosures on Consumer Motor Vehicles Because of the Large Gaps Deliberately Left by the Drafters To Be Filled by the Courts on a State-by-State Basis.**

The lack of uniformity in this area is based on history. When the Uniform Commercial Code was first adopted by the various states in the 1950s and 1960s, the goal was for it to serve as a substitute for "federal commercial law" enacted by Congress, combining the principle of states' rights with the need for uniformity in commercial law. Article 9 of the UCC governs both commercial and consumer secured transactions, and sets forth a body of rules governing

enforcement of security interests when a debtor goes into default. These rules cover (1) when "default" occurs to trigger the creditor's duty to comply, (2) the secured party's right to repossess the collateral, (3) the secured party's right to dispose of the collateral after repossession, (4) the duty of the creditor to give notice to the debtor of an impending foreclosure sale of the collateral, (5) the elements of a "commercially reasonable" foreclosure sale, (6) the option of holding a "strict foreclosure" instead of a sale, (7) the debtor's right to redeem the collateral prior to sale, and (8) an array of remedies for the debtor if the secured creditor misbehaves during foreclosure.

Article 9 contains some important rules giving consumer debtors greater protection than business debtors. Chief among these is the minimum civil penalty (the entire finance charge for the debt plus ten percent of the original principal) that is triggered by creditor misbehavior during foreclosure. For the most part, however, Article 9 defers to other state laws when it comes to "consumer protection". Yet it is often unclear how these other laws fit with Article 9 of the UCC. The relationship of one law with another must ultimately be decided by the courts of the various states. It is not surprising that no area of the UCC has been litigated as heavily as the enforcement rules under Article 9.

About the same time that the UCC was being enacted around the country, special "consumer protection" legislation such as retail installment sales acts and deceptive trade practice acts were also being enacted in various states. Most states enacted a RISA and/or a deceptive trade practice statute of some sort. The drafters of the UCC were fully aware of these special consumer statutes and deferred to them from the beginning. Old UCC 9-203(4) (later re-enacted as Section 9-201) specified that, in case of conflict between Article 9 and a RISA, the RISA controls. This growth of consumer protection laws as an overlay to Article 9 made the UCC "non-uniform" for consumer transactions from Day One. It is not an exaggeration to say

that "uniformity" is both a misnomer and a mirage when it comes to the various states' laws governing enforcement of consumer secured transactions. Congress also recognized the limits of the UCC in responding to special concerns for consumer debtors when it enacted the Federal Truth in Lending Act in 1968—a statute that provides a federal overlay to the law governing consumer secured transactions covering collateral such as motor vehicles. The Commissioners on Uniform State Laws tried to regain the initiative by promulgating the Uniform Consumer Credit Code in the late 1960s and 1970s, but variations of that statute have only been enacted in about 15 states. (I worked on the drafting of the UCCC in 1972.) Because of these overlays, to which Article 9 defers, there is huge non-uniformity built into the law governing foreclosure on consumer vehicles from state to state.

Article 9 of the UCC was amended by the Commissioners on Uniform State Laws in 1972, and again in 2001. The original Section 9-203(4), deferring to other consumer protection legislation in every state, was re-enacted as Section 9-201 in 1972 and again re-enacted in 2001. The history of the 2001 amendments to Article 9 is particularly revealing. I served on the Study Committee that began the comprehensive revision of Article 9 in 1990; this process was co-sponsored by the Commissioners on Uniform State Laws and the American Law Institute. The Final Report of the Study Committee, released in 1992, contained no consumer-related revisions. However, an initial working draft prepared by the Drafting Committee in 1994 contained a number of consumer-protection provisions to add to Article 9, and these provisions were approved by the Drafting Committee in the fall of 1997, over strong opposition from consumer creditor representatives. In early 1998, more meetings were held among different interest groups, resulting in a "consumer compromise" now reflected in Revised Article 9. This "compromise" includes three elements directly relevant to the present case:

\*UCC 9-626 adopts the "rebuttable presumption" rule for faulty foreclosures of collateral owned by **business** debtors. However, 9-626 excludes **consumer** transactions from the rebuttable presumption rule, leaving it to the courts to determine the proper rule to apply. This leaves consumer advocates free to argue the "absolute bar" rule as the proper sanction for creditor misbehavior during a consumer foreclosure. A few states (including Ohio) eliminated the "consumer exclusion" from their version of 9-626. In the vast majority of states where the consumer exclusion was retained, however, it is very difficult to predict which deficiency claim rule a court will apply in a consumer foreclosure. As of this date, there is precious little case law under Revised Article 9 to provide any clarity. Before 2001, most states applied the rebuttable presumption rule. Since 2001, the trend has continued to move away from the absolute bar rule.

\*Can a consumer wipe out a misbehaving creditor's deficiency claim **and** recover the minimum civil penalty mandated by UCC 9-625? As part of the "consumer compromise"; the drafters were unable to establish a clear rule on this critical issue. Instead, as with the deficiency claim issue, they leave it to the courts on a state-by-state basis. This "we punt" approach is described in Official Comment 3 to UCC 9-625: "Because Section 9-626 does not apply to consumer transactions, the statute is silent as to whether a double recovery or other over-compensation is possible in a consumer transaction." Ohio eliminated the possibility of double recovery for consumers in its current version of 9-625.

\*Even ignoring state and individual variances, is a class action appropriate for violation of a statute that provides liberal minimum civil penalties for a consumer in an individual claim based on noncompliance with the default/foreclosure rules of Article 9? On that issue, too, the drafters "punted" to the courts of the various states. A good discussion of the "consumer compromise", and the problems of uncertainty it has created, is found in a recent Ohio State Law

Journal article by one of the two principal drafters of Revised Article 9. Mooney, *The Consumer Compromise in Revised Article 9: The Shame of It All,* 68 Ohio St. L.J. 215 (2007).

In the interest of getting Revised Article 9 enacted on a nation-wide basis, the drafters simply gave up on "uniformity" with respect to consumer transactions.

**B.      Consumer Protection Legislation in the 50 States, To Which Article 9 Defers, Is Itself Subject to Great Variation.**

Based on patterns of enactment around the country, there are two types of "consumer protection" legislation that can affect the enforcement/foreclosure rules of the UCC: (1) retail installment sales statutes and (2) deceptive trade practice statutes. The problem is that both of these categories of consumer protection laws vary greatly from state to state.

In many states, the only post-repossession notice requirement is found in Article 9 of the UCC. Most states also have a retail installment sales statute that governs foreclosure of security interests on consumer motor vehicles and to which Article 9 of the UCC defers. Yet those states' statutes vary greatly. Some state statutes, like those modeled after the Consumer Credit Code, require only a **pre-repossession notice** to the consumer of the right to cure a default by tendering the delinquent installments. The Kansas statute on which I worked in the 1970s is a good example. In these states, the only **post-repossession notice** requirement is found in Article 9 of the UCC, particularly Sections 9-613 and 9-614. In other states—such as Connecticut, Illinois, Louisiana, Maryland, and Pennsylvania—a special post-repossession notice is required, including a right to cure prior to foreclosure sale, on top of the UCC requirements. As far as I can tell, Ohio is unique as being the only state where the debtor is required to receive **three notices**—two post-repossession notices under the RISA and the UCC notice of a foreclosure sale. In some of these states it is not clear what the remedy is for noncompliance, or whether the UCC remedies are applicable for noncompliance with the RISA. Many of these RISA statutes

don't include a statute of limitations or a conflict-of-laws rule, leaving these issues to the courts of the various states. In some states, there is a substantial body of decisional law construing the RISA; in others, there is nothing. Overall, the picture is one of great confusion and uncertainty, with substantial variations from state to state.

The deceptive trade practice statutes that have been enacted in most states present a similar picture. These statutes can be important in determining remedies for violating UCC or RISA foreclosure notice requirements. In some states it is possible to "piggyback" such a violation so that it constitutes a "deceptive trade practice", allowing recovery of attorney's fees and statutory penalties beyond what would otherwise be available under the UCC or the RISA statutes. In many cases, the biggest uncertainty involves the scope of the deceptive trade practice statute. In some states, these statutes can't be used against a secured lendee/assignee because the statute only covers deceptive practices made by a seller of goods during the sales transaction (e.g., deceptive ads or misrepresentations regarding the goods). This was Judge Sargus' decision in construing the Ohio Consumer Sales Practices Act in his earlier Opinion and Order. In other states, the scope of the deceptive trade practice statute is broader. For example, the Kansas Consumer Protection Act (which I helped draft) is not limited to sellers and it could include violation of other statutes by secured lenders (other than regulated banks). In many states, the scope of the deceptive trade practice law—and whether it can "piggyback" onto violation of another statute—is unclear. The deceptive trade practice laws also have a great variety of statutes of limitations, running from one year at the low end to six years or more at the high end. Some deceptive trade practice laws don't have any statute of limitations for deceptive acts and practices, so that a court would have to transplant one from another statute. As with the various

RISA laws, the deceptive trade practice laws present a state-specific picture of non-uniformity and uncertainty.

## SECOND OPINION: THERE ARE A NUMBER OF STATE-SPECIFIC VARIABLES THAT APPLY TO ANY FORECLOSURE ON CONSUMER VEHICLES

Based on my 42 years of experience in consumer credit compliance, and the materials I have reviewed in connection with my writings on the subject, there are a number of state-specific variables that come into play for each foreclosure on a consumer motor vehicle. In my opinion, there are at least six state-specific variables that are particularly relevant with respect to claims involving defective foreclosure sale notices. Because of these variables, and the absence of clear case law in many jurisdictions, one is required to make a "50-state guess" on the law governing enforcement of consumer vehicle foreclosures. The six variables are as follows:

*State-Specific Variable #1: Has the Consumer Really "Defaulted"? In most cases involving foreclosure on consumer motor vehicles, the debtor is clearly in default by failing to make a payment or violating some covenant in the security agreement. Assuming a repossession of the vehicle without breach of the peace, the duty then arises for the secured creditor to give advance notice of the foreclosure sale, under both the UCC and the various RISAs. In some cases, however, there is no "default" by the borrower because the lender "called" the loan without justification, or made some affirmative misrepresentation. This can happen when the secured creditor fails to give notice of right to cure before repossession, as required by some retail installment sales laws such as the Consumer Credit Code. Or the creditor may establish a pattern of acquiescing to late payments, then suddenly pull the plug without prior notice. Or the secured creditor may have violated some other contractual duty, which led the consumer to

suspend payments. In these "lender liability" cases, the consumer is not in "default" and the creditor seeks to enforce its security interest prematurely. In any of these cases, it is an issue of fact as to whether the debtor is truly in "default". Ms. Jenkins raises this issue in her complaint when she challenges the basis for repossession and makes a conversion claim.

The enforcement and foreclosure rules of the UCC presuppose default on the part of the debtor; however, nowhere does Article 9 define "default". Nor is default defined in Section 1-201 (the "General Definitions" Section of the UCC). Again, this leads to ambiguity as states must refer to other legislation, such as the Uniform Consumer Credit Code, or to their courts for guidance. If default has not occurred, and the secured creditor undertakes self-help repossession prematurely, then it may be that the enforcement rules of the UCC—including foreclosure sale notice requirements—never come into play. This is the suggestion of UCC 9-601. Instead, the repossession would probably constitute tortious "conversion" even though it was done without breach of the peace. This characterization of the consumer's claim might well justify (1) actual damages measured by the fair market value of the vehicle, (2) punitive damages and (3) recovery of attorney's fees, in addition to possible recovery under the applicable RISA. In any case, the rules on premature repossession vary greatly from state to state.

*State-Specific Variable #2: Was the Foreclosure Notice Really Defective? As I understand the present case, the primary issue is whether Hyundai's post-repossession notices were defective or not sent at all. In my opinion, this issue can only be resolved on a state-by-state basis. In that respect, the foreclosure sale notice requirements of the various states contrast sharply with failure to comply with disclosures mandated by a single federal statute such as Truth in Lending. Different courts in different states could view compliance through different lenses. Some courts could require "strict compliance" while others might allow "substantial

compliance" with the statutory guidelines, under both the UCC and the various RISAs. A good example is provided by the requirement of the UCC that each pre-disposition notice include a statement "that the debtor is entitled to an accounting of the unpaid indebtedness and states the charge, if any, for an accounting." UCC 9-613(1)(D). Whether this statement of accounting must be provided separately, or whether a summary of the unpaid balance on the face of the form is sufficient, will depend on the compliance standards that have been employed in each state, based on prior case law.

Another variable is when the foreclosure took place. A notice that does not comply with Revised Article 9 of the UCC (effective in most states on July 1, 2001) may well comply with the somewhat simpler requirements under the pre-revision version of Article 9. Similarly, some RISA laws require only a single post-repossession notice, while some (such as Ohio) require two such notices, one different from the other. In short, in each state the notice requirements are not only different among themselves, but uncertain in their relationship to each other. Moreover, the mere failure to send appropriate notice is not determinative of liability in every state. Though the requirements of UCC 9-613 and 9-614 are generally "uniform", the gaps left in Article 9, and the consumer protection laws to which Article 9 defers, erase this uniformity.

*State-Specific Variable #3: What are the Remedies for Noncompliance? Since the UCC first became effective throughout the country in the 1960s, the appropriate remedies for violating its rules in consumer transactions have been subject to great state-by-state variation. Even though the default rules appear "uniform" in Sections 9-611 and 9-613, the differences in Sections 9-625 and 9-626 create a wide variance in available remedies. This variance is crucial even though recovery of "actual damages" is authorized by UCC 9-625(b). In cases where a foreclosure notice is defective, it is often difficult for a plaintiff to prove actual damages.

Although damages vary from case-to-case depending on the value of the collateral, the loss of use, unforeseen circumstances, etc., they are typically small in amount because they are reduced by the amount that the deficiency is "eliminated or reduced" under UCC 9-626. That is the reason that almost all of the cases dealing with creditor misbehavior during consumer foreclosures focus on (1) elimination of the creditor's deficiency claim under UCC 9-626 and (2) recovery of minimum civil penalties under UCC 9-625.

There is no statutory uniformity at all with respect to a misbehaving creditor's right to a deficiency following foreclosure. Under the old version of Article 9, courts around the country had invoked three very different rules: (1) an "absolute bar rule" under which creditor misbehavior during foreclosure would preclude any deficiency; (2) a "rebuttable presumption rule" under which a noncomplying creditor has the burden of proving that its noncompliance did not prejudice the debtor because the sale itself was held in a proper manner and fetched a fair price; and (3) a "setoff" rule under which the debtor could offset against the creditor's deficiency claim any other damages that it could recover under the UCC. During the revision of Article 9, the drafters acknowledged the "**nonuniformity** resulting from court decisions" (Official Comment No. 4 to UCC 9-626) (emphasis added) and simply refused to deal with the issue. Instead, they agreed to leave it to the courts of the various states as part of the "consumer compromise" of 1998. UCC 9-626(a) uses a "rebuttable presumption rule" for **business** foreclosures only. UCC 9-626(b) puts it this way:

> The limitation of the rules in subsection (a) to transactions other than consumer transactions is intended to leave to the court the determination of the proper rule in consumer transactions. The court may not infer from that limitation the nature of the proper rule in consumer transactions and may continue to apply established approaches.

What are we left with? It seems clear that courts in a state that had invoked the "absolute bar" rule for consumer foreclosures under old Article 9 would be free to keep that rule under Revised Article 9. However, another court in the same state would have the discretion to apply the "rebuttable presumption" rule to consumer transactions on the ground that there is no principled distinction based on the identity of the debtor. Some states have a broad body of case law jurisprudence on the issue under old Article 9, while others have a blank. The issue of whether a deficiency claim against a consumer debtor can be erased was a highly contentious one during the drafting of Revised Article 9, and will continue to be under Revised Article 9. The only certainty is that the matter can be argued both ways, and is subject to state-by-state analysis.

The second remedy that is crucial in cases like this is recovery of minimum "statutory" damages under UCC 9-625(c). As mentioned above, these damages—the entire finance charge plus 10% of the original principal amount—can be very large, more than $20,000 in a six-year contract for an expensive motor vehicle. Though the damages appear to be automatic for even a technical violation of the UCC foreclosure rules, with no discretion on the part of the court, courts in some states have concluded that failure to give notice doesn't trigger the statutory damages unless the bad notice leads to a "commercially unreasonable" sale. Even if recovery of damages under 9-625(c) is automatic in a given state, there is great uncertainty about whether a consumer can **combine** elimination of a deficiency with an affirmative claim for statutory damages, the so-called "double-whammy". In some states, including Ohio before 1992, the double-whammy has been okayed by the courts; in others, it has not. It's all in the discretion of the court in a given state, sometimes with the aid of established case law in that state and sometimes not. There are also many legislative variations. A further complication is that some

states might allow a deceptive trade practice claim on top of the UCC claims, while another may not. Finally, it's not at all clear how remedies found in some RISA statutes relate to remedies available under the UCC. The only thing that is clear is that the law governing remedies is not uniform among the states.

A third remedy that may be available in some states is statutory damages and recovery of attorney's fees under a deceptive trade practice statute, which is "piggybacked" onto a violation of a RISA or the UCC. By contrast, based on this Court's earlier Opinion and Order, such a remedy is not available in Ohio because the assignee of an installment contract is not considered a "supplier" under the Ohio Consumer Sales Practices Act.

Article 9 is silent on whether a class action is appropriate for a statute that includes a liberal minimum civil penalty for creditor noncompliance. The issue came up during the drafting of Revised Article 9. The February 1998 draft provided that the total recovery in a consumer class action seeking the minimum civil penalty for each transaction could not exceed the lesser of $500,000 or one percent of the secured party's net worth. On this point, the UCC drafters were using the model found in the federal Truth in Lending Act. This provision was deleted in the 1998 "consumer compromise", where it was agreed that Revised Article 9 would be silent on the class action issue. In the absence of a uniform statute on the point, how courts in the various states would deal with the issue is completely unclear.

In my opinion, some courts would conclude that the UCC minimum civil penalty is a sufficient incentive for individual suits, so that class action treatment is unnecessary. This issue came up in the early days of Truth in Lending, when the federal statute contained no provision for class actions. A class action was brought in New York against the issuer of a credit card whose disclosure form did not comply with the requirements of TILA. The court refused to

certify the class, finding that recovery based on multiplying the TILA minimum civil penalty ($100) by the number of members in the class "would be a horrendous, possibly annihilating punishment, unrelated to any damage to the purported class or to any benefit to defendant for what was at most a technical and debatable violation of the Truth in Lending Act." Ratner v. Chemical Bank of New York, 54 FRD 412 (S.D.N.Y. 1972). Courts in other states might not be willing to apply the rationale in Ratner to the minimum civil penalty in Article 9 of the UCC, even though the UCC penalty can be much larger than the TILA penalty.

*State-Specific Variable #4: Did the Noncomplying Notice Constitute Commercial Unreasonableness?   Under the decisional law in some states, a noncomplying notice of foreclosure sale is not enough, by itself, to justify elimination of a deficiency claim; the right to a deficiency remains unless the noncompliance results in a "commercially unreasonable" foreclosure sale.  In such states, the consequences of failure to give notice depend on other factual elements of "commercial reasonableness", which can only be determined on a case-by-case basis.  Similarly, in "rebuttable presumption" states, the right of the secured creditor to rebut the presumption created by failure to give notice of the foreclosure sale necessarily involves factual issues that must be decided on a case-by-case basis. As a third example, some states have a RISA that wipes out deficiency claims if the secured creditor has not disposed of the collateral in a "commercially reasonable manner."  In these states, the deficiency is eliminated only if the faulty notice amounts to a "commercially unreasonable" disposition.  The likelihood of getting to these factual issues of "commercial reasonableness" will depend on how a given state views the seriousness of the defective notice.   Ultimately, it will be a state-by-state analysis.

*State-Specific Variable #5: What Statute of Limitations Applies? Revised Article 9 of the UCC contains no statute of limitations governing violation of its enforcement rules. The

same is true of most RISA statutes and deceptive trade practice statutes. Which statute of limitation is appropriate will vary greatly from state to state. There are many possibilities, as the case law has shown. One possibility is that a court would apply the four-year limit found in UCC 2-725 dealing with the sale of goods, as some courts have done; other courts reject that approach on the ground that claims involving the financing of consumer goods like motor vehicles are not within the scope of 2-725, which relates more to the "sales" aspect of the transaction. A second possibility is to apply the state statute of limitations dealing with liability based on a general "statutory" claim. A third possibility is to use the state's statute for actions by "assignees", which can be as short as one year. A fourth possibility is to use the state's statute for claims arising out of "written contracts". Moreover, courts in some states would apply a discovery rule that could toll the statute of limitations depending on individual facts. Some states even have "residual" limitations to cover cases not otherwise covered by a more specific statute of limitations.

To make matters even more complicated, the proper statute of limitations may vary based on the remedy that the plaintiff is pursuing. In particular, where the UCC statutory damages are being sought, a court might well apply a statute of limitations that covers "penalties" on the ground that the UCC statutory damages bear no relationship to the harm suffered by the plaintiff. (In Ohio, for example, the statute of limitations for a "penalty or forfeiture" is one year.) If the same plaintiff is also seeking a wipe-out of the creditor's deficiency claim, another statute of limitations may apply. In short, in the absence of a uniform statute of limitations in the UCC, it is impossible to predict what limitations will be applied in a given state for a UCC claim, and the applicable limitations could also vary for different remedies sought under a single statutory claim.

**\*State-Specific Variable #6: Choice of Law.** The Hyundai motor vehicle installment sales contracts I have reviewed contain a choice-of-law provision that appears to be based on the location of the dealer. Though Article 9 of the UCC does not have a choice-of-law rule that governs enforcement of security interests in consumer motor vehicles, UCC 1-105(1) allows the parties in both commercial and consumer contracts to choose as the governing law a state that bears a "reasonable relation" to the transaction.

Again, uncertainty and lack of uniformity reign. If a consumer who lives in Kansas City, Missouri buys a new car in Kansas City, Kansas and the installment contract is keyed to Kansas law, which state's UCC rules and RISA rules control foreclosure? Does Missouri law control because enforcement occurs in that state? Or does Kansas law control under the choice-of-law provision in the contract? Does it make a difference if Kansas has a RISA with a choice-of-law rule (K.S.A. 16a-1-201) providing that Kansas law controls consumer credit transactions "made in this state"? So long as laws are not uniform, the choice-of-law analysis must be done on a state-by-state basis to determine the applicable enforcement rules. As examples of the importance of choice-of-law analysis, State A may have an "absolute bar" rule governing deficiencies; State B may have a "rebuttable presumption" rule. State A may allow "double whammy" recovery, while State B does not. State A may have a policy against allowing class actions where a single consumer can recover substantial civil penalties; another state may not have such a policy. The examples could go on and on.

**\*Individual Variables.** Overlaying these state-specific variables is an additional level of case-by-case inquiry. Under Section 9-613, the sufficiency of notice is ultimately a "question of fact." Individual circumstances—including whether notice was sent at all, when it was sent, who received it, what it contained, what the consumer understood, and whether the consumer

obtained additional information—could all come into play. Likewise, determining whether a sale is "commercially reasonable" is fact-intensive. I devote a chapter to this in my treatise on Secured Transactions. Relevant factors include the duty to fix-up collateral, the appropriateness of a public or private disposition, the duty to publicize the sale (including an adequate description of collateral, vital statistics, the availability of collateral for private inspection, and the scope of publicity), how long the collateral should be held prior to sale, the relevance of the price obtained, the problem of two-step dispositions, and several variations of recourse and repurchase. In addition, individual facts determine whether there was really a "default", if and when the statute of limitations is tolled, the amount of actual damages, and the choice-of-law. Ms. Jenkins' factual situation highlights some of these differences, as she alleges unusually high actual damages and makes a claim in conversion.

### THIRD OPINION: THE PICTURE IN OHIO IS ILLUSTRATIVE OF THE DIFFICULTY IN APPLYING UNIFORM RULES NATION-WIDE

The law in Ohio governing enforcement of security interests in consumer motor vehicles is representative of other states in its large areas of uncertainty. Ms. Jenkins' claims—violation of the post-repossession notice requirements of the Ohio RISA and the Ohio UCC—graphically illustrate the problem. Moreover, Ohio is a state that has important **nonuniform** amendments to the UCC, confusing Official Comments to those nonuniform amendments, **nonuniform** provisions in its RISA, and confusing cross-references between the UCC and the RISA.

**Uncertainties under the Ohio RISA.** In my opinion, the Ohio Retail Installment Sales Act, which dates back to 1953, is different from RISA legislation in other states, and in itself poses a number of difficult interpretational issues. Unlike some other RISA legislation, the Ohio statute does not include a duty to notify the debtor of a right to cure the default by tendering the missed payments **prior to repossession**, which is the typical RISA pattern. Instead, the Ohio

statute is unusual in its requirement that the secured lender give **two notices after repossession** but before foreclosure—a notice of right to cure that must be sent within five days after repossession (1317.12) and a notice, at least ten days prior to sale, giving details about the proposed sale and the creditor's right to a deficiency (1317.16). Both of these amendments were added to the statute in 1972. The Ohio RISA also mandates a **public sale** of the collateral, which contrasts sharply with Article 9 of the Ohio UCC and seems inconsistent with standard industry practice to use dealer auctions for motor vehicles (which are considered **private sales.)**

Because 1317.16(C) (amended in 2001, along with Revised Article 9 of the UCC) refers to many of the UCC enforcement rules that continue to apply but does not refer to the UCC notice rules (1309.613 and 1309.614), it seems unclear whether the RISA notice requirements "occupy the field" for consumer transactions in Ohio. (In a number of states which don't have this type of RISA, Article 9 of the UCC provides the only notice rules for consumer foreclosures.) Similarly, in line with this Court's earlier Opinion and Order, even if a UCC remedy is available in the form of possible loss of the deficiency claim under 1309.626, it remains unclear whether the minimum civil penalty could be recovered under 1309.625.

Though this Court has previously ruled that the Ohio six-year statute of limitations for claims of "unenforceability" applies under the Ohio RISA, it seems very possible that RISA claims seeking the UCC minimum civil penalty as a remedy would be governed by the one-year Ohio statute of limitations for "penalty or forfeiture". Does violation of the Ohio RISA notice rules entitle the consumer to reduction of a deficiency or minimum civil penalties if this noncompliance did not make the disposition "commercially unreasonable"?

The fit between the Ohio RISA and the UCC is uneasy, at best, just as in other states. The interpretational problems posed by the Ohio RISA, and its relationship to Article 9 of the

UCC, were analyzed 25 years ago in Lipson, "Repossessing From Ohio Consumers—The Interaction of Article Nine and the Retail Installment Sales Act", 13 Toledo L. Rev. 1282-1374 (1982). In my opinion, these areas of uncertainty have only increased since that time.

**Uncertainties under the Ohio UCC.** The enforcement rules of Article 9 of the Ohio UCC have an unusual history. Applying the old version of Article 9 as it existed prior to 1992, the Ohio Supreme Court concluded that giving a defective foreclosure notice on a consumer motor vehicle allowed the plaintiff to recover a "double whammy", i.e. absolute bar of the deficiency claim **plus** Article 9 statutory damages. Kruse v. Voyager Ins. Cos., 648 N.E.2d 814, 26 UCC Rep.2d 999 (Ohio 1995). (The Kruse decision never mentions the Ohio RISA, presumably because it didn't apply.) The court also clearly characterizes the statutory damages as a "punishment" because they bear no relation to the plaintiff's actual loss, as this Court noted in its earlier Opinion and Order. Perhaps in response to the Kruse case, the Ohio legislature amended the UCC in 1992 to shift to the "rebuttable presumption" rule for both commercial and consumer foreclosures, and that non-uniform provision was carried forward into Revised Article 9, 1309.626(C). To add a measure of confusion, Baldwin's Ohio Revised Code Annotated includes the "Official Comments" to Revised Article 9, which are inconsistent with Ohio's nonuniform amendment to 9-626.

The next Ohio nonuniform amendment to Article 9 occurred in 2004, when 1309.625 was amended to add a new and unique subsection (D). Under the new subsection, any statutory damages recovered under subsection (C) "shall be reduced by the amount that the sum of the secured obligation, expenses, and attorney's fees exceeds the proceeds of collection, enforcement, disposition, or acceptance" **regardless** of whether the debtor's deficiency is eliminated or reduced under the rebuttable presumption rule. This language requires an offset of

any deficiency claim from the statutory damages otherwise available. Before 2004, the consumer's minimum damages were only offset by the deficiency if the creditor successfully rebutted the presumption. In this manner, Ohio has moved from the "absolute bar" rule and "double whammy" remedy that existed before 1992, to the "rebuttable presumption" rule in combination with statutory damages from 1992 until 2004, to the current "offset" rule. This legislative direction is clearly pro-creditor.

The current rule will apparently vary from one consumer claimant to another, depending on the size of the deficiency. For example, according to my calculations, Ms. Jenkins could claim statutory damages of about $10,000 and was subject to a deficiency claim of about $14,000. Because her claims arose out of a pre-2004 foreclosure, her statutory damages would be $10,000 and would **only** be reduced by the amount of her deficiency if Hyundai were able to rebut the presumption under 1309.626. By contrast, a post-2004 Ohio claimant with the same numbers would get no statutory damages at all, **regardless** of whether the deficiency was reduced or not, because those damages ($10,000) would have to be reduced by $14,000, leaving a negative number under subsection (C). In either case, recovery under 1309.626, in the form of a reduced deficiency, would depend on whether the consumer's failure to receive notice of the foreclosure sale led to actual damages because it made the sale "commercially unreasonable". That is the effect of the rebuttable presumption rule, which is fact-specific. Under the Ohio nonuniform version of the UCC, these remedies will also vary depending on the size of the deficiency. For example, a post-2004 consumer whose statutory damages are $10,000, but whose deficiency obligation is only $2,000, could recover $8,000 under 1309.625(C) and might or might not escape all or a portion of the deficiency, depending upon whether the secured

creditor was able to rebut the presumption.[1] While this formula is unique to Ohio, there is a wide variance in nonuniform amendments to UCC 9-625 and UCC 9-626 from state-to-state.

**Applying the State-Specific and Individual Variables in Ohio.** As a way of summarizing the uncertainties in Ohio, it is useful to review the six state-specific variables discussed above:

*Consumer "Default".* The materials I have reviewed, including Ms. Jenkins' deposition, indicate that she may not have been in "default" on her installment contract. She consistently contends that the repossession itself was wrongful because of the manner in which Hyundai handled her disability insurance claim. When asked "What is the substance of your notice claim?", she responds "Just the repossession of my car." Moreover, she stated that she had no money to redeem in any case. In my opinion, most other Ohio claimants won't have the same kind of "wrongful repossession" claims as Ms. Jenkins.

Given Ms. Jenkins' unique factual situation, the foreclosure notices would not be relevant and her car would have been tortiously converted when it was repossessed in the absence of "default". Under Ohio law, as I understand it, damages for tortious conversion are measured by the fair market value of the goods, coupled with the possibility of punitive damages and attorney's fees. It seems likely that most other consumers in Ohio would **not** be able to claim a wrongful repossession, so that the rules governing defective foreclosure notices would be applicable and the consumer would be limited to a different set of remedies under the Ohio RISA and UCC.

---

[1] It is also possible that Ohio's 2004 amendment to 1309.625(D) could apply retroactively, if courts determine that the provision is remedial and does not affect substantive rights. If the amendment is applied retroactively, then the new rule would apply to all cases that came to trial after the new amendment's effective date on November 5, 2004 even if the foreclosure sale took place before November 5, 2004. If the new amendment is not applied retroactively, then claims involving a foreclosure that took place prior to the effective date could reduce the consumer's minimum damages by the deficiency only if the credit rebutted the presumption under 1309.626(D). This is another complicated area of law in Ohio.

In an analogous situation, Ohio law seems to recognize that a secured creditor "waives" the legal right to declare a default when it allows the consumer to miss a number of installment payments without blowing the whistle. Peoples Liberty Bank & Trust Co. v. Gavin, 41 N.E.2d 150 (Ohio App. 1942); Suburban Trust v. Campbell, 19 Ohio Misc. 74 (1969). Under the rationale of these cases, any subsequent repossession would be wrongful and would constitute a conversion. Walter v. National City Bank, 42 Ohio St. 524, 330 N.E.2d 425 (1975).

*Noncompliance of Notice. Noncompliance with the UCC notice requirements may depend on when the Ohio foreclosure took place. If it took place prior to the revision of the UCC in 2001, the UCC requirements regarding the notice would be different than if the foreclosure took place after July 1, 2001, as it did with Ms. Jenkins.

*Remedies for Noncompliance. With respect to remedies for noncompliance, as discussed above, it seems likely that the Ohio remedies could differ greatly for different Ohio claimants, depending on whether the foreclosure took place before 2004 or afterward, and depending on the size of the deficiency. The Ohio formula in 1309.625(D)—reducing the statutory damages in 1309.625(C) by the amount of the creditor's deficiency without regard to whether the deficiency is reduced or eliminated under the "rebuttable presumption" rule—seems unique in the country. So does the Ohio rule that a debtor whose deficiency is eliminated or reduced under 1309.626 may not otherwise recover **actual damages** under subsection (B). At the very least, this language raises serious interpretational problems. It shows the confusion that results from legislative tinkering with a "uniform" state law.

The question of "transplanting" remedies from the UCC to the RISA to fill the gap left by the Ohio legislature in 2001 is made more confusing by the language of 1309.201(c), which

provides that failure to comply with consumer protection statutes like the Ohio RISA "has only the effect provided in those [consumer statute] provisions."

*Commercial Reasonableness.  The element of commercial reasonableness—a fact-intensive issue—remains important in Ohio under the rebuttable presumption rule of 1309.626(C).  In Howard v. SunStar Acceptance Corp., 2001 WL 481936 (Ohio. App. 2001), the court used UCC remedies to fill a gap left by the Ohio RISA for violation of its notice requirements—a transplantation that might not be allowed in other states.  Moreover, the court in Howard remanded the case to the trial court to determine whether the disposition of the collateral was "commercially unreasonable"—a fact-specific issue that will differ with each Ohio claimant. The individual variations mentioned above apply within Ohio as well.

*Proper Statutes of Limitations.  This Court ruled in its prior Opinion and Order that the proper statute of limitations for recovery of actual damages under 1309.625(B) was six years, while the limitation applicable to recovery of statutory damages under 1309.625(C) is one year. The applicable statute thus varies greatly depending upon the UCC remedy sought.  In my opinion, it remains unclear what the proper statute of limitations is in Ohio for a secured creditor's recovery of a deficiency claim including a consumer's defense to such a claim—an issue that has been the subject of much litigation in other states.  In Martin v. First Nat'l Bank of Massillon, 573 F.2d 958 (6th Cir. 1978), the court concluded that a claim under the Ohio RISA is not one for "penalty or forfeiture", but rather a claim for "unenforceability."  The RISA claim in Martin, however, did not involve a "penal" provision like the statutory damages given to consumers under 1309.625(C).

*Choice of Law.  Ms. Jenkins' claim apparently involves no choice-of-law issue.  Other claimants, however, may have purchased a vehicle in Kentucky or Indiana, with a choice-of-law

provision that chooses the place of purchase as controlling law. As discussed above, such provisions are strongly encouraged by the Ohio UCC (1301.105). It remains unclear whether notice given to an Ohio resident in Ohio will make Ohio law controlling, in spite of the choice-of-law provision.

## CONCLUSION

Once you get below the surface, the Uniform Commercial Code is not uniform, particularly with respect to consumer credit transactions. The chief drafter of Revised Article 9 made this point in a recent article: "The consumer compromise produced a uniform text of Revised Article 9, but the substance of the law applicable to consumer secured transactions remained nonuniform." Mooney, *The Consumer Compromise in Revised Article 9: The Shame of It All*, 68 Ohio St. L.J. 215, 226 (2007). Sections 9-611, 9-613 and 9-614 are deceptively superficial because the default provisions of Article 9 must be understood as a whole. Any violation implicates remedies that vary widely from state-to-state. The Code is also nonuniform in the way states intersect their application of Article 9 with their own Retail Installment Sales Acts, consumer protection statutes, and/or other laws. Even within states, these laws are complicated and their implications uncertain, due to frequent amendments and insufficient case law. Some of Ohio's laws relating to post-repossession notice and consumer recovery are unique in the country. Ms. Jenkins' unique situation illustrates how individual facts determine key issues, such as whether there was a default, what statute of limitations applies, what choice-of-law applies, whether the foreclosure sale was "commercially reasonable", and ultimately what the consumer can recover, if anything at all. The colossal task of determining all the state-by-state and case-by-case variances for these multiple issues would bog down a court and hinder

consumer redress. In my opinion, determining proper jury instructions in itself would be nearly

impossible.

_Barkley Clark_
Barkley Clark

_10/23/07_
Date

## EXHIBIT A

# VITA OF BARKLEY CLARK

Stinson Morrison & Hecker LLP
bclark@stinsonmoheck.com
(816) 691-2433

### EDUCATION

Amherst College (B.A. 1962; Phi Beta Kappa)
Harvard Law School (LL.B. 1965)

### CURRENT POSITION

Partner, Stinson Morrison & Hecker LLP., Washington, DC and Kansas City; Member, Financial Institution Practice Group
Adjunct Professor of Law at University of Virginia School of law, where I taught commercial/banking law, 2003-05

### PRIOR POSITIONS

Partner, Shook Hardy & Bacon, LLP, Washington, DC, 1989-2006
Adjunct Professor of Commercial and Banking Law, Georgetown Law Center (2001-2003)
Adjunct Professor of Law, University of Kansas, 1990 - 1998
Visiting Professor of Law, University of Michigan, summer 1991
Professor of Law, National Law Center, George Washington University, Washington D.C., 1985-1989
Robert A. Schroeder Distinguished Professor of Law, University of Kansas, 1982-1985
Professor of Law, University of Kansas, 1972-1982
Associate Professor of Law, University of Kansas, 1969-1972
Visiting Professor of Law, University of Oregon, 1972
Visiting Professor of Law, University of Colorado, 1968
Practice of law at Holme Roberts & Owen in Denver, Colorado, from 1965-1969, with emphasis on commercial and banking law

## LAW PRACTICE

My law practice has concentrated on various aspects of banking, commercial law and financial services. Subjects include payment systems and cash management; product warranties under Article 2 of the UCC and the Magnuson-Moss Warranty Act; Third-party service contracts; bank deposits, collections and payments under Articles 3 and 4 of the UCC, Regulation CC and Regulation J; documentary drafts; wire transfers under Article 4A of the UCC and FRB Reg. J; letters of credit under Article 5 of the UCC and the UCP; investment securities under Article 8 of the UCC; secured transactions under Article 9 of the UCC and related consumer credit legislation; bank regulatory problems; commercial and consumer compliance issues for financial institutions; deceptive trade practices; alternative payment systems; check kiting litigation; check forgery issues; bank liability for fraud of customer. Consultant to sellers of goods and financial institutions and their counsel around the country. Frequent qualification as expert witness in commercial/banking law litigation in federal and state courts and before arbitration panels. I have made appellate arguments for clients such as E*Trade Bank (10th Circuit) and Bank One (7th Circuit) and worked on a variety of appellate briefs involving commercial/banking law issues.

## TEACHING

Teaching interests have included commercial law, payment systems, consumer protection, federal regulation of banking, consumer financial services, creditors' rights and bankruptcy, sales and warranty liability, legislation, and local government; winner of six "best teacher" awards at the University of Kansas School of Law and the National Law Center, George Washington University; winner of "best lecturer" awards for the Colorado and Kansas Bar Review courses; since 1971, frequent speaker at legal seminars throughout the country sponsored by ALI/ABA, the UCC Institute, PLI, Virginia CLE, the Banking Law Institute, National Association of Bankruptcy Trustees, International Factoring Association and other organizations, on subjects including banking law, check collection, secured transactions, factoring, product warranties, wire transfers, letters of credit, UCC and bankruptcy; conductor of in-house seminars on commercial law and banking topics at large law firms such as Shearman & Sterling in New York; Akin, Gump in Washington; Milbank, Tweed in New York; And Mayer, Brown Rowe & Maw in Chicago.

## LOCAL GOVERNMENT/ PUBLIC POLICY

Served as member of Lawrence, Kansas City Commission for ten years (1973-1983) and served two terms as Mayor of Lawrence. Member of the Board of Directors of the League of Kansas Municipalities. Substantial intergovernmental work with Douglas County Commission. Taught Local Government Law at KU Law School and in the KU MPA program for 16 years. Wrote several law review articles on Kansas local government law. Argued cases before the Kansas Supreme Court on local government law issues. Worked with the Kansas legislature on various aspects of local government law, including governmental tort immunity. Served as counsel to the KCK/Wyandotte County Consolidation Commission. Strong interest in the legislative process and public policy.

## BAR AND OTHER PROFESSIONAL/CONSULTING ACTIVITIES
### (Past and Present)

American Bar Association, Co-Chair of Committee on Article 9 of the UCC; American Law Institute and National Conference of Commissioners on Uniform State Laws, member of Special Committee to Redraft UCC Article 9; Reporter, The Business Lawyer, in its Annual Review of Secured Transactions; Board of Editors, The Banking Law Journal; Board of Editors, The UCC Law Journal; Board of Editors, Journal of Payment Systems Law, Special Consultant to the Federal Reserve Board (Equal Credit Opportunity and Truth-in-Lending); Special Counsel to the National Conference of Commissioners on Uniform State Laws (Uniform Consumer Credit Code); Member, American College of Consumer Financial Services Attorneys and American College of Commercial Finance Lawyers; Special Advisor to the Colorado, Nebraska and Kansas Legislatures on the UCC, the Consumer Credit Code, and deceptive trade practice legislation; Board of Directors, League of Kansas Municipalities; Associate Dean, University of Kansas School of Law; Director, Lawrence National Bank; consultant to major law firms, financial institutions, and the American Bankers Association on various aspects of commercial and banking law; special counsel to the Kansas Bankers Association in dealing with a wide variety of community banks and bank legislation; listed in Best Lawyers in America 1994-2006; Order of the Coif.

## PUBLICATIONS: BOOKS

(1)     The Law of Bank Deposits, Collections and Credit Cards (co-authored by Barbara Clark). This treatise is published by Sheshunoff/A.S. Pratt & Sons, one of the most important publishers of commercial law books in the country. The treatise is supplemented tri-annually. The book has become one of the two standard works in the field (along with Brady on Bank Checks), frequently cited by federal courts and state appellate courts. It discusses wire transfers, bank deposits and collections, documentary collections, federal regulatory compliance issues; Regulation CC; electronic fund transfers, and related subjects such as letters of credit and bank setoffs. It also discusses bank liability for customer fraud, identity theft, money laundering, federal preemption, the Know Your Customer principle, and other deposit-side compliance issues.

(2)     The Law of Secured Transactions under the Uniform Commercial Code (co-authored by Barbara Clark). This treatise, also published by Sheshunoff/A.S. Pratt & Sons, is supplemented tri-annually. It is also one of the standard works in the field, frequently cited by state and federal courts around the country. This book won the Rice Prize for Scholarship at the University of Kansas in 1981.

(3)     The Law of Product Warranties (Second Edition, 2002) (with C. Smith and Barbara Clark). This treatise is published by Thomson West Publishing Co., and is supplemented annually. It synthesizes the law of consumer and commercial product warranties, drawing on both Article 2 of the UCC and the Federal Magnuson-Moss Warranty Act. The book won the Rice Prize for Scholarship in 1985.

(4)     Cases and Materials on Consumer Protection (1990) (with F. Miller). This casebook was published by Michie/Bobbs-Merrill as part of its "contemporary legal education" series.

(5)     Handling Consumer Credit Cases (1972) (with J. Fonseca), published by Lawyers Cooperative Publishing Co.

(6)     Volumes 2, 4 and 7 of the Kansas Statutes Annotated, Kansas Comments to the Uniform Consumer Credit Code, the Kansas Consumer Protection Act, and the Uniform Commercial Code (particularly Articles 3, 4, 5 and 9). These Comments, which appear after each section of the relevant statutes, contain comprehensive editorial analysis of the three statutes, written from the point of view of the drafter in the case of the U3C and the KCPA. The Comments, written for the Revisor of Statutes, are frequently relied upon by Kansas courts in construing the three statutes.

(7)     PLI, Warranties in the Sale of Business Equipment and Consumer Products, 1980-1985.

(8)     Regulation CC: Funds Availability and Check Collection (1988) (with Barbara Clark).

(9)     PLI, Letters of Credit and Banker's Acceptances.

(10)    Truth In Savings: Legal Analysis and Compliance Strategies (1992) (with Barbara Clark and Mark Hargrave).

(11)    Compliance Guide to Payment Systems (2002) (with Mark Hargrave)

(12)    Compliance Guide to Payment Systems for Credit Unions (with Mark Hargrave)published by Sheshunoff/A.S. Pratt

(13)    Check 21 Manual: A guide to Check Truncation Law and

<u>Electronic Payment Systems</u> (2004) (with Barbara Clark )

(14)     <u>Clarks' Guide to Electronic Check Collection</u> (2006) (with Barbara Clark)

## PUBLICATIONS: LAW REVIEW ARTICLES

(A number of these articles have been cited by a variety of appellate courts, including the United States Supreme Court in <u>Mitchell v. W.T. Grant Co.</u>, 416 U.S. 600, 629 (1974) (Justice Powell concurring)

(1)     "Sniadach, Fuentes and Beyond: The Creditor Meets the Constitution", 59 Va. L. Rev. 355 (1973) (with J. Landers)

(2)     "Preferences Under the Old and New Bankruptcy Act", 12 Uniform Commercial Code Law Journal 154 (1979)

(3)     "Suretyship in the Uniform Commercial Code", 46 Tex. L. Rev. 453 (1968) (reprinted at 1 UCCLJ 303 (1969))

(4)     "State Control of Local Government in Kansas: Special Legislation and Home Rule", 20 Kan. L. Rev. 631 (1972)

(5)     "Default, Repossession, Foreclosure and Deficiency: A Journey to the Underworld and a Proposed Salvation", 51 Ore. L. Rev. 302 (1972)

(6)     "The FTC Holder Rule and UCC Article 2: The Law Is A Seamless Web", 10 UCCLJ 119 (1977)

(7)     "Oil and Gas Financing Under the Uniform Commercial Code", 43 Denver L.J. 129 (1966)

(8)     "The First Line of Defense in Warranty Suits: Failure to Give Notice of Breach", 15 UCCLJ 105 (1982)

(9)     "Bank Exercise of Setoff: Avoiding the Pitfalls", 98 Banking Law Journal 196 (1981)

(10)    "UCC Articles 9 and 10: Some Problems Solved and Some Problems Created", 38 U. Colo. L. Rev. 99 (1965)

(11)    "The Agricultural Transaction: Livestock Financing", 11 UCCLJ 95 (1978)

(12)    "The Agricultural Transaction: Equipment and Crop Financing", 11 UCCLJ 15 (1978) (reprinted in 1 Ag. L.J. 172 (1979))

(13)    "The Foreclosing Creditor under Article 9: Perilous Pitfalls Aplenty", 8 UCCLJ 291 (1976)

(14)   "Beefing up Product Warranties: A New Dimension in Consumer Protection", 23 Kan. L. Rev. 567 (1975) (with M. Davis; winner of Rice Prize for Scholarship)

(15)   "The Uniform Consumer Credit Code: Assessing Its Impact Upon One State and Plugging its Loopholes", 18 Kan. L. Rev. 277 (1970)

(16)   "The Revolution in Consumer Credit Legislation", 45 Denver L.J. 679 (1968)

(17)   "Lemon Aid for Kansas Consumers", 46 Journal of the Kansas Bar Association 143 (1977)

(18)   "Wyatt Earp and the Winelist: Is a Restaurant an 'Open Saloon'?", 47 J.K.B.A. 63 (1978)

(19)   "Interest Rates in Kansas: The Decline and Fall of Ezekiel", 49 J.K.B.A. 81 (1980)

(20)   "The New Article 9 Amendments", 44 J.K.B.A. 131 (1975)

(21)   Book Review, "Handbook of the Law Under the UCC", by James W. White and R. Summers, 58 Cornell L.R. 1273 (1973)

(22)   Monthly Newsletter, Clarks' Secured Transactions Monthly, published by Sheshunoff/Pratt and co-authored with Barbara Clark. This newsletter highlights developments in asset-based lending, both real estate and personal property

(23)   Monthly Newsletter, Clarks' Bank Deposits and Payments Monthly, published by Sheshunoff/Pratt and co-authored with Barbara Clark. This newsletter focuses on various aspects of payment systems, including bank deposits and collections.

(24)   Survey, Secured Transactions, Business Lawyer, August, 1988, and August, 1989

(25)   "Scheduled Debt Payments as Preferences: Paradigm of the Plain Meaning Rule", 1 Jour. of Bankr. Law and Practice 7 (1991)

## EXHIBIT B

### EXPERT WITNESS TESTIMONY OF BARKLEY CLARK

In re Krug, 189 BR 948, 28 UCC Rep.2d 709 (Bankr. D. Kan. 1995) (testified at trial as to secured lender's duty of reasonable care in handling cattle repossessed from debtor)

Chicago Title Ins. Co. v. California Canadian Bank, 2 Cal. Rptr.2d 422, 16 UCC Rep.2d 445 (Cal. Ct. App. 1991, review denied, Cal. 1992) (testified at trial as to timeliness of return to checks by payor bank involved in check-kiting scheme of depositor, and impact of clearinghouse rules)

United States v. Officers of Silverado, U.S. Dist. Ct. Colo. 1994 (testified in criminal trial in defense of officer of defunct S&L regarding commercial law issues in the case)

Cromwell v. Commerce & Energy Bank, 464 So.2d 721, 40 UCC Rep. 1814 (La. 1985) (testified by video deposition regarding the negotiability of standby letters of credit)

SCADIF, S.A. v. First Union Nat'l Bank of Florida, 208 F. Supp. 2d 1352, 48 UCC Rep.2d 232 (S.D. Fla. 2002), aff'd 344 F.3d 1123 (11th Cir. 2003) (provided trial testimony regarding whether check was a "cash item" or "collection item" for late return purposes)

Kelly v. Central Bank & Trust Co. of Denver, 794 P2d 1037, 12 UCC Rep.2d 1089 (Colo. Ct. App. 1990) (testified at trial regarding commercial reasonableness of bank in taking checks for deposits)

CIT Group/Sales Financing, Inc. v. E-Z Pay Used Cars, Inc., Case No.: 98C206P (Dist. Ct. of Crawford County, Kansas) (testified at trial regarding the reasonableness of a commercial finance company's refusal to fund a line of credit for a used vehicle dealer)

First Century Bank v. Community Nat'l Bank, Civ. Action No. 7:00CV 00904 (W.D. Va.) (testified at trial regarding bank's return duties on kited checks under Reg. CC)

National Council of Churches of Christ v. First Union Nat'l Bank, No. 97-1851, 1998 WL 416744 (4th Cir. 1998) (testified at trial regarding duties of bank in opening deposit account out of which were later drawn checks bearing forged endorsements)

Guidry v. Bank of LaPlace, 661 So.2d 1052 (La. Ct. App. 1995), aff'd 666 So.2d 296 (La. 1996) (testified at trial on behalf of a bank in a case where an investor who lost money to a ponzi scheme fraudster sought to recover from the bank where the fraudster's company maintained its deposit account)

TME Enterprises, Inc. Norwest Corp., LASC Case No. BC 183236 (Cal. Super. Ct. 2002), aff'd 22 Cal. Rptr.3d 146, 55 UCC Rep.2d 385 (Cal. Ct. App. 2004) (testified at trial regarding a bank's duty to monitor wire transfers where there is a discrepancy between beneficiary's name and deposit account number, automated environment for wire transfers, and "business judgment" rule)

<u>Wells Fargo Brokerage Services, LLC v. Hanson</u>, NASD Arbitration No. 00-05530 (testified in lender liability case before arbitration panel regarding the duty of a bank to foreclose and sell securities falling value)

<u>Blackwell v. Wells Fargo Bank, N.A.</u>, Case No. 170 Y 14800264-02 (American Arbitration Association, San Antonio, Texas) (testified before arbitration panel regarding bank's liability for Ponzi scheme of its customer and nature of the "Know Your Customer" principle)

<u>Blackwell v. Wells Fargo Bank, N.A.</u>, Case No. 04-05041-LMC (Bankr. W.D. Tex.) (report and deposition re bank's liability for Ponzi scheme of its customer and nature of "Know Your Customer" principle)

<u>Lafayette Investments, Inc. v. Jeter, Rains & Byrn</u>, Cir. Ct. of Jackson County, MO., 1998 (testified at trial in legal malpractice case based on failure of law firm to make UCC filing on used vehicle inventory of dealer)

<u>Thomas Kernaghan & Co.</u>, Ltd. et al. v. Western Trade Corp., et al, Case No. 10-4105-CIV-HUCK/TURNOFF (S.D.Fla.) (testified at trial regarding stock transfer issues including UCC Article 8 adverse claim mechanism)

<u>Wyatt v. Phillips.</u>, No. 004165 (Ct. Com. Pls. Philadelphia, Pa.) (testified at trial regarding leveraged buyouts as fraudulent convenances)

Testified at trial/administrative hearing in states of Connecticut (2002), Illinois (2003) and New Mexico (2005), on behalf of <u>Dell Computer Co./Dell Catalog Sales, Inc</u>. regarding distinction between a "warranty" and a "service contract" for purposes of Dell's sales/use tax liability in those states.

<u>U.S. v. Payment Processing Center, LLP</u>, 461 F. Supp.2d 319 (E.D. Pa. 2006) (trial testimony regarding nature of provisional credit for checks)

<u>Golden West Refining Co. v. Suntrust Bank</u>, 2006 WL 4007267, 61 UCC Rep.2d 1011 (C.D. Calif. 2006) (report and deposition in case involving "perpetual" standby letters of credit)

<u>LaSalle Business Credit, LLC v. ChinaTrust Bank (U.S.A.)</u>, Case No. BC 304063 (Cal. Super. Ct.) (testified at trial regarding various issues in take-out of asset-based loan)

<u>Effective Shareholder Solutions, inc. v. National City Corp.</u>, Case No. A0603767 (Ohio Ct. Com. Pleas) (deposition in case regarding method of posting checks)

<u>Freeman v. First Union Nat'l Bank</u>, Case No. 00-2013-CIV-HUCK (S.D. Fla.) (testified by deposition regarding late check return issues)

<u>U.S. Bank v. First Nat'l Bank of Missouri, et al.</u>, Case. No. 02CV216237 (Cir. Ct. Jackson County, Mo.)



McGLINCHEY STAFFORD PLLC ————————

**ATTORNEYS AT LAW**

LOUISIANA   MISSISSIPPI   NEW YORK   OHIO   TEXAS

**JEFFREY R. SEEWALD**
(713) 335-2102 Direct Dial
(713) 520-1025 Facsimile
jseewald@mcglinchey.com

October 23, 2007

*Via Federal Express*
Linda S. Mullenix Ph.D
722 Crystal Creek Dr.
Austin, Texas 78746

     Re:    No. C2 04 720; *Jenkins, et al. v. Hyundai Motor Fin. Co., et al*; In the United
          States District Court for the Southern District of Ohio, Eastern Division.

Dear Dr. Mullenix:

    Enclosed for your review is the Expert Report of Barkley Clark. If you have questions or
comments, please feel free to contact me.

               Very truly yours,

               McGlinchey Stafford, PLLC

               By:_____
                  Jeffrey R. Seewald

JRS/ima
Enclosures

cc:    *Via Email*
        James Wertheim (Firm) (w/enc.)
        Anthony Rollo (Firm) (w/enc.)
        Jason Erb (w/enc.)

183910.1